# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00725-CR

**Janeen Denise Smith, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM COUNTY COURT AT LAW NO. 1 OF CALDWELL COUNTY
### NO. 39055, HONORABLE EDWARD L. JARRETT, JUDGE PRESIDING

## O P I N I O N

Following a bench trial, appellant Janeen Denise Smith was convicted of the offense of failure to identify and sentenced to 90 days' confinement in county jail. *See* Tex. Penal Code Ann. § 38.02(b) (West 2011). The conviction was based partly on proof that she had identified herself to a law enforcement officer using a nickname by which she had undisputedly been known, both professionally and personally, for almost two decades. On appeal, Smith contests whether her nickname was either "false" or "fictitious" within the meaning of the statute and, in turn, whether evidence that she used it was legally sufficient to sustain her conviction. Smith also asserts that the trial court abused its discretion in refusing to permit her to withdraw a prior waiver of her right to jury trial. On the record here, we will overrule both complaints and affirm the trial court's judgment.

## BACKGROUND

The State alleged that on November 25, 2007, Smith intentionally gave a false or fictitious name to Jeff Ferry, a person Smith knew to be a peace officer who had lawfully arrested

or detained Smith at a time when a valid arrest warrant had been issued for her. *See id*. § 38.02(b) ("A person commits an offense if he intentionally gives a false or fictitious name, residence address, or date of birth to a peace officer who has: (1) lawfully arrested the person; [or] (2) lawfully detained the person"), (d) (offense is class A misdemeanor if person is "fugitive from justice" at time of offense); *see also id.* § 38.01(5) (West 2011) ("fugitive from justice" is "a person for whom a valid arrest warrant has been issued"). Following a lengthy procedural history that we will detail as it becomes relevant to our analysis, Smith was eventually tried for the offense in April 2010. Only two witnesses testified during trial—Ferry, who at the time of the offense had been employed with the Caldwell County Sheriff's Office, and Smith. The following recitation of facts is taken from the transcript of the trial.

Ferry testified that while on patrol on November 25, 2007, at approximately 6:15 p.m., he was dispatched to a residence in Caldwell County to investigate a report of a missing vehicle. When Ferry arrived at the residence, he encountered a female complainant and requested her name and date of birth. According to Ferry, the complainant told him that her name was "Jay Smith" and that her date of birth was June 21, 1971.

At some point, Ferry "determined the complaint was not a criminal issue, it was a civil issue and there was no involvement on the sheriff's office behalf we can assist her with." (From Smith's subsequent testimony during the trial, it appears that the vehicle had been in the possession of an ex-boyfriend of the complainant.) However, according to Ferry, he "did advise her if we located the vehicle through patrol, I'd make a phone call back to her." Ferry then returned to his patrol.

2

"During the course of that patrol," Ferry recounted, he located the vehicle that the complainant had described to him. Ferry then ran a license plate check and ascertained that the registered owner was a "Janeen Smith." Given that the vehicle had matched the description the complainant had given him, Ferry surmised that the registered owner, Janeen Smith, was likely the same "Jay" Smith with whom he had spoken. However, "it seemed odd" to Ferry "that someone would be deceitful about their name," so he ran a warrant check on Janeen Smith. It revealed that Janeen Smith had three active warrants through the City of Lockhart.[1] The warrants had been signed by a magistrate several months earlier, on March 23, 2007.

Smith was subsequently advised that her vehicle had been found "in a safe spot" and that there was no reason for law enforcement to take further action because "no criminal offense" had occurred. Smith thereafter made several "hang up calls" to 911 "demanding that we do something about her vehicle." Ferry characterized these calls as "abusive" and a "criminal offense." In response to the calls, Ferry returned to Smith's residence on the following day.[2] Upon his arrival, Ferry noticed the vehicle he had observed on the preceding day.[3] This fact, according to Ferry, seemed further confirmation "that Janeen Smith and Jay Smith were, in fact, the same person." Then, Ferry recounted:

---

[1] Copies of the arrest warrants were admitted into evidence. The offenses described in the warrants—all of which were classified as fine-only misdemeanor offenses—were "failure to maintain financial responsibility" (i.e., not carrying insurance on her motor vehicle); having an expired or "no registration" license plate; and "failure to appear / bail jumping."

[2] Ferry did not specify the time that he returned to Smith's residence. However, Smith later testified that Ferry had returned to her residence approximately "24 hours later."

[3] Smith later explained that "the person [who] had possession of the vehicle [had] brought it back."

3

I spoke with Ms. Smith briefly about the abusive 911 warning, repeated calling harassments of that and the criminal offense that was present with that [sic]. And then advised her she was being lawfully detained. Requested her name. Heard her say Jay Smith. I then asked her if that was the name on the driver's license. She said it was. I then asked her if that was the name on the warrants through the City of Lockhart and she just kind of stared at me.

Ferry elaborated that he had detained Smith for "multiple reasons. . . . She had at least three warrants. We believed one of them [was] for failure to appear. We had the abusive 911 [calls] we were investigating and then we had the initial complaint for the vehicle. So I wanted to make sure that [the vehicle] was returned to the right person and the right place." Further, according to Ferry, "I believed she was committing an offense by lying to me with her information and I wanted to make it very clear that she was detained and that she was being lawfully detained. And that I just wanted to make sure that we were—we met all the elements to the offense of failure to ID." Ferry also described Smith's reaction when confronted with the outstanding warrants as "dumbfounded and upset," adding that "[s]he protested going to jail, but not that she had warrants."

Ferry also testified that the name on Smith's driver's license was "Janeen Denise Smith." While acknowledging that Smith never misstated or misled him regarding her surname, Ferry perceived that she had intentionally provided what he believed to be a false first name because she "knew she had active warrants out of Lockhart" and "didn't desire to go to jail that night."

On cross-examination, defense counsel challenged the inference that Smith had ever intended to deceive Ferry regarding her identity. Counsel elicited Ferry's acknowledgment that he did not have any direct evidence that Smith had received notice of the outstanding warrants before he confronted her with them. Ferry likewise admitted that none of Smith's representations regarding her missing vehicle had turned out to be false. On redirect, however, Ferry testified that Smith had

4

given him inconsistent years of her birth during their two encounters—1971 during the first encounter, 1969 during the second.[4]

Defense counsel challenged the State's premise that "Jay" Smith was a "false" or "fictitious" name. Ferry agreed with defense counsel that the first letter of the name Janeen is "J," that if the letter "J" is spelled out phonetically, it would be spelled "j-a-y," and that the name "Jay Smith" was not "totally inconsistent" with the name "Janeen Smith." Ferry further agreed that during his investigation, he had found it "reasonable to assume" that "Jay Smith was the same person as Janeen Smith." Counsel also drew a comparison to the Caldwell County District Attorney's longstanding use of a nickname—Richard (Trey) Hicks—and elicited Ferry's opinion that he did not regard "Trey" to be a "false" or "fictitious" name. Additionally, attempting a distinction between Ferry's query regarding the name on Smith's *driver's license* and the elements of the offense, defense counsel elicited Ferry's acknowledgment that Smith's incorrect response of "Jay Smith" did not in itself mean that "Jay Smith" was a "false" or "fictitious" name.

Following Ferry's testimony, Smith moved for a directed verdict on the ground that the State had failed to prove that Smith had given Ferry a "false" or "fictitious" name. The trial court denied the motion.

Smith testified in her defense. Continuing her attack on the State's premise regarding her use of a "false" or "fictitious" name, Smith explained that "J-a-y" Smith was merely a variant

---

[4] Smith later testified that her actual birth date was July 21, 1969. Smith attributed the discrepancy to a mistake by Ferry in transcribing the correct date in his report following their first encounter. According to Smith, she and Ferry had engaged in a "heated" argument regarding her demand that law enforcement retrieve her vehicle. Smith claimed that Ferry became "more and more agitated" as the argument progressed, and insinuated that his "agitation" had caused him to unintentionally transcribe the wrong birth date in his report.

of Janeen Smith that she had used for many years. Smith, who is employed as a construction manager, described the origin of this name as follows:

> When I was working in Lubbock, Texas, approximately 17 years ago, my co-workers began calling me that name due to the fact that we had several employees that had similar names and it was quite confusing, so at that point they began calling me Jay Smith. When I began working in construction, my employers and my co-workers continued calling me that name, issued business cards to me with that name, issued checks to me in the name J-a-y Smith.

Smith testified that she did not believe Jay Smith to be a false or fictitious name, "due to the fact that most of the people in Caldwell County have known me since I was a child and they are associating the name Jay Smith with me."

Smith similarly denied any intent to deceive Ferry, insisting that she had innocuously given him the name "Jay" Smith "[o]ut of habit for doing it for 17 years." She also claimed that when contacting law enforcement for assistance in recovering her vehicle, she had fully anticipated that authorities would use the license plates and registration information, ascertain that "Janeen Smith" was the owner, and use that information to link the vehicle to her.

Smith also professed that at the time she had contacted law enforcement, she had no knowledge of her outstanding warrants. Smith explained, "Based on my conversations with [the] municipal court, I felt that I had paid all the monies that I owed at the time," and claimed to have been "quite surprised" when she was informed by Ferry that she had warrants out for her arrest. On the other hand, Smith acknowledged that the mailing address listed on the warrants was her valid mailing address.

Smith offered into evidence three exhibits. Exhibit 1 was a copy of Smith's resume, created in 2004 but which, according to Smith, she had been using for "quite some time."

6

Printed at the top of the resume was the name "Jay Smith." Exhibit 2 contained three letters of recommendation for Smith from her prior employers, dated October 2006. Each letter made reference to the defendant as "Jay Smith" or "Jay" rather than "Janeen Smith" or "Janeen." Exhibit 3 was a printout of an email message from Smith. The email's "From" line contained the following name and address: "Jay Smith [contactjaysmith@yahoo.com]." Although the message was dated March 31, 2010, the email thread included a prior message to that same email address dated February 28, 2007.

On cross-examination, Smith acknowledged that her "legal name" had always been Janeen Smith, that Janeen Smith was the name on her driver's license, and that Janeen Smith was the name under which her vehicle was registered. Smith also acknowledged that when she had submitted an application to the apartment in which she currently resides, she had provided the name "Janeen Smith" because she "didn't want the application process to be delayed" by difficulties the name discrepancy could create in running criminal or credit checks. The State then elicited the following testimony:

Q: But you weren't aware that when giving a name to a police officer, he's going to need to know what your legal name is, what your real name is in order to check and see if you had warrants?

A: He asked me for my driver's license. I assumed that's how he was going to establish identification. I then informed him that the driver's license was in my wallet in the car that I was attempting to retrieve.

Q: But still you didn't feel that it was necessary to give him the name Janeen?

A: He didn't make an issue of it the first time he came out to the residence.

Q: All right. Because he didn't have any reason to suspect your name was anything other than Janeen—or Jay, I'm sorry?

7

A:     Right. He never gave me any indication that would be an issue over the name Jay Smith.

The trial court found Smith guilty of the charged offense. Punishment was assessed at 90 days' confinement in county jail and Smith was sentenced accordingly. This appeal followed.

## ANALYSIS

**Jury waiver**

In her first issue, Smith asserts that the trial court violated her constitutional and statutory right to a jury trial. *See* U.S. Const. amend. VI; Tex. Const. art. 1, § 10; Tex. Code Crim. Proc. Ann. art. 1.12 (West 2005). Smith waived her right to a jury trial at a pretrial hearing in which she was not represented by counsel. *See* Tex. Code Crim. Proc. Ann. art. 1.13 (West 2005). However, at a subsequent pretrial hearing in which she was represented by counsel, Smith sought to withdraw her waiver. The trial court denied Smith's request. On appeal, Smith argues that her initial waiver of a jury trial was ineffective. She further claims that the trial court abused its discretion in denying her post-waiver request for a jury trial.

A defendant has an absolute right to a jury trial. *Hobbs v. State*, 298 S.W.3d 193, 197 (Tex. Crim. App. 2009). However, a defendant also has the right to waive the right of trial by jury. *See Adams v. United States*, 317 U.S. 269, 275 (1942); *Hobbs*, 298 S.W.3d at 197; *see also* Tex. Code Crim. Proc. Ann. art. 1.13(a) (West 2005). The waiver must be made in person by the defendant in writing in open court with the consent and approval of the court, and the attorney representing the state. Tex. Code Crim. Proc. Ann. art. 1.13(a). In a misdemeanor case, the classification of the offense of conviction here, "[a] defendant may agree to waive a jury trial

8

regardless of whether the defendant is represented by an attorney at the time of making the waiver."[5] *Id*. art. 1.13(c). When a waiver is challenged on appeal, the State must establish through the trial record an express, knowing, and intelligent waiver of jury trial. *Hobbs*, 298 S.W.3d at 197 (citing *Guillett v. State*, 677 S.W.2d 46, 49 (Tex. Crim. App. 1984); *Samudio v. State*, 648 S.W.2d 312, 314 (Tex. Crim. App. 1983)).

Smith waived her right to jury trial during a pretrial hearing held on October 1, 2009, after she entered a plea of not guilty. The record reflects the following exchange:

The Court: All right. So tell me where we want to go now. Do you want a trial before the court, or do you want a jury trial?

Ms. Smith: Trial before the court.

The Court: Now that means that I, as the judge, hear all the evidence and make a determination of whether or not you're guilty. And if I find you guilty, [then I] make a determination of what punishment, if any, would be appropriate. Do you understand that?

Ms. Smith: I understand.

The Court: And you still want to do that?

Ms. Smith: Yes, I do.

The Court: All right. I need a waiver of jury. He's got a form to fill out that we do with everybody.

While the jury-waiver form was being retrieved, the trial court proceeded to discuss with Smith her right to counsel and her desire to waive that right. After Smith signed a form waiving her right to counsel, the trial court next presented her with the jury-waiver form:

---

[5] In a felony case, before a defendant who has no attorney can agree to waive a jury trial, the court must appoint an attorney to represent him. *See* Tex. Code Crim. Proc. Ann. art. 1.13(c) (West 2005).

9

| | |
|---|---|
| The Court: | Here is also a written document entitled Defendant's Jury Waiver and what it says is, "Comes now defendant in the above styled and numbered cause, Number 39055, State versus Janeen Denise Smith and hereby intelligently, knowingly and voluntarily—and we have two things checked—waives the right to trial by jury upon the issue of guilt or innocence and waives the right to trial by jury upon issue of punishment. Is that correct? |
| Ms. Smith: | Correct. |
| The Court: | All right. Then you'll need to sign it right there where it says defendant, please. All right, do you have any questions about the waiver of the right to an attorney or the waiver of the jury trial? |
| Ms. Smith: | No. |
| The Court: | All right. Then I'm going to approve both matters. |

The jury-waiver form, which has been included in a supplemental clerk's record, is consistent with the above statements by the trial court and contains the signatures of Smith, the trial court, and the attorney for the State. *See* Tex. Code Crim. Proc. Ann. art. 1.13(a).

In summary, the trial court first asked Smith if she wanted a trial by jury or a trial before the court. Smith stated that she wanted a trial before the court. The trial court then explained to Smith the meaning of a trial before the court and asked her if she understood. Smith answered, "I understand." The trial court again asked her if that was what she wanted. Smith stated, "Yes, I do." The trial court then presented Smith with a jury-waiver form, explained the contents of the form to her, and asked her if the form was correct in indicating that she was "intelligently, knowingly and voluntarily" waiving her right to a trial by jury. Smith answered, "Correct." After obtaining her signature on the form, the trial court then asked her if she had "any questions about the waiver." Smith answered, "No." We conclude that the above record establishes that Smith made an express, knowing, and intelligent waiver of her right to a jury trial. *See Patton v. United States*, 281 U.S. 276,

10

312 (1930) (for jury waiver to be effective, there must be "express and intelligent consent of the defendant"); *Hobbs*, 298 S.W.3d at 203 n.42 ("For a waiver of a constitutional right to be valid the record must show that it was voluntarily and knowingly made."); *see also Adams*, 317 U.S. 269, 278-79 (1942) (explaining that unrepresented defendant can waive her right to jury trial without advice of counsel).

We next address whether the trial court abused its discretion in denying Smith's subsequent request to withdraw her jury waiver. "[O]nce the defendant validly waives [her] right to a jury trial, [she] does not have an unfettered right to reassert that right." *Hobbs*, 298 S.W.3d at 197. "[W]hen an accused validly waives trial by jury, a subsequent request by the accused to withdraw the jury waiver is addressed to the discretion of the trial court." *Marquez v. State*, 921 S.W.2d 217, 221 (Tex. Crim. App. 1996) (plurality op.). A trial court abuses its discretion when it acts arbitrarily or capriciously, without reference to guiding rules and principles. *See Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990); *Taylor v. State*, 255 S.W.3d 399, 401 (Tex. App.—Texarkana 2008, pet. ref'd); *Green v. State*, 36 S.W.3d 211, 213 (Tex. App.—Houston [14th Dist.] 2001, no pet.).

To protect the "inviolate" nature of the right to jury trial, the trial court should ordinarily "permit withdrawal of the waiver so long as it is in good faith and there are no adverse consequences." *Marquez*, 921 S.W.2d at 222; *Green*, 36 S.W.3d at 214. However, the burden to show an absence of adverse consequences rests not with the State but with the defendant. *See Hobbs*, 298 S.W.3d at 197; *Marquez*, 921 S.W.2d at 223. "While a defendant begins with an absolute right to a jury trial, once that right has been waived, the defendant who seeks to withdraw that waiver occupies the position of a party seeking to change the status quo." *Marquez*, 921 S.W.2d

11

at 223. The defendant who seeks to change the status quo by withdrawing her waiver "must establish, on the record, that [her] request to withdraw [her] jury waiver has been made sufficiently in advance of trial such that granting [her] request will not: (1) interfere with the orderly administration of the business of the court, (2) result in unnecessary delay or inconvenience to witnesses, or (3) prejudice the State." *Hobbs*, 298 S.W.3d at 197-98. "If the defendant's claims are rebutted by the State, the trial court, or the record itself, the trial judge does not abuse his discretion in refusing to allow the withdrawal of the waiver." *Id.* at 198. Moreover, "[a] silent record does not mean that the state, witnesses, and trial court did not in fact suffer prejudice; it merely means that proof was not offered on the issue." *Marquez*, 921 S.W.2d at 223 n.7.

In this case, the trial court's decision to deny Smith's request to withdraw her jury waiver must be considered in the context of the case's lengthy procedural history. The trial court summarized this history during the October 1, 2009, pretrial hearing, and the following summary is taken from that recital.

Smith first appeared in court on April 7, 2008. Smith was subsequently appointed an attorney, and she and her attorney next appeared in court on November 5, 2008. At that time, Smith requested a continuance so that she could hire an attorney to replace her court-appointed counsel. The trial court granted Smith's request. On December 15, 2008, Smith returned to court without an attorney, and the matter was reset for a pretrial hearing on February 26, 2009. At the hearing, the matter was reset until May 11, 2009, "for a jury trial with or without an attorney." On that date, Smith, still acting pro se, presented a motion to dismiss, and the trial court scheduled a hearing on June 4, 2009, to consider the motion. However, at that appearance, Smith again requested

12

a continuance, which the trial court granted. On June 18, the trial court heard Smith's motion to dismiss, construed it as a motion to quash the information, and granted the motion.

The following day, on June 19, 2009, the State filed a new complaint and information against Smith, alleging the same offense. The matter was set for arraignment on August 24, 2009. On that date, Smith, again acting pro se, filed a "motion to postpone arraignment" and another motion to dismiss the charges. The trial court postponed the arraignment for October 1, 2009. At this hearing, parts of which we have summarized above, Smith was formally arraigned, entered her plea of not guilty, waived her right to counsel and her right to a jury trial, and argued her motion to dismiss, which the trial court denied.

Also at this hearing, the trial court scheduled the case for trial. Smith asked for the trial to be scheduled "after the holidays." The trial court denied Smith's request. It explained, "You're the one that's complaining this has drug [sic] on too long. You can't say [that] at one time and then the next time, no, I want it to drag on longer." The trial court asked the State and Smith how much time they each needed to present their case. Both sides estimated that they needed approximately one hour. The trial court reviewed its calendar and set the case for trial on October 23, 2009. It explained to Smith that "this is what we call a special setting. That's my juvenile date, generally. But I'm going to take the afternoon of Friday, [the] 23rd and set your case at 1:30 in the afternoon." Both sides agreed to that date. The trial court then advised Smith that she could still hire an attorney despite her waiver of counsel. However, the court admonished her that she "must do so no later than October the 15th or you can't get a continuance." The court explained,

> You can hire a lawyer any time you want to walk in. But just if you hire one . . . on the 22nd and he walks in and says, "I'm not ready because I just got hired," I won't give a continuance at that time. You want this case over. I want [this] case over,

okay. So you can hire one any time you want, but you won't be able to get a continuance because you just hired an attorney if you do it after October the 15th.

Smith indicated that she understood, and the proceedings were recessed.

On October 19, Smith returned to court and filed an application for a court-appointed attorney. The trial court granted the request and appointed counsel for Smith. On December 3, 2009, Smith filed and the trial court granted a motion to substitute retained counsel for appointed counsel, and the case was reset for pretrial on January 28, 2010.

The January 28 pretrial hearing began with the trial court inquiring into "when can we be ready to go to trial" and "how long is it going to take to try" the case. In contrast to the parties' earlier representations of needing only an hour for each side, Smith's counsel anticipated that the trial could take "a day or two," while the prosecutor remarked that she did not think "it should be more than a day" because she did not believe "there are that many witnesses." When asked how many witnesses the State had, the prosecutor replied, "Maybe two officers. I don't think there's more than that." The trial court then asked the same question of Smith's attorney, who answered, "We—hypothetically, we've got ten witnesses, but they would be very short . . . ." After the trial court expressed surprise at this number, counsel added, "But it would be the kind of thing where I'd put them on for maybe 20 minutes apiece or less and then just move right through them, I would think."

The trial court then began to discuss the scheduling of the trial, at which point the request for a withdrawal of Smith's waiver of a jury trial was made:

The Court: Okay. So this is a trial before the court. What's your schedule look like? Because obviously we ran into a

14

scheduling problem today. So tell me what your schedule looks like realistically.

Defense counsel: Well, first of all, I know you had said "trial before the court" and we had some discussion previously about that, that she had requested a jury trial. May I make that request at this time?

The Court: You may make that request, but I'm going to deny it.

Defense counsel: Okay.

The Court: Okay. I have a waiver signed. She's had two counsel before you. She presented some motions on her own behalf that she prevailed with the Court. I think she knows exactly what she's doing when she waived the jury.

Defense counsel: I understand. And just for the record, then, Your Honor, we would move to withdraw the waiver of jury trial.

The Court: Certainly. Denied.

Smith's counsel did not pursue the matter further or make any argument as to why Smith should be allowed to withdraw her waiver. The following then occurred:

The Court: So if we need a full day, generally a Friday of a jury week is my best day.

Defense counsel: Okay.

The Court: And I have a jury week next week. It is next week, but I'm looking at the wrong calendar. So there will be that.

Prosecutor: I believe that trial dates in February and March are exactly the same, so I believe it's the week of the 1st and then the week of the—for both I think there's trial dates the week of February 1st and—well, 16th since Monday is President's Day and then it would be March 1st and then I think the trial that week is—

15

| | |
|---|---|
| The Court: | All right, I know I have a civil trial March 1st. I'm going to try to do one criminal. We're only going to have one prosecutor, so that changes that. March 15th I have turned over to the JPs for jury, so really it'd be like the week of March the 29th. So I'd be looking at Friday, April the 2nd. How does that look for you? |
| Defense counsel: | That would be fine, Judge. |
| The Court: | Okay. |
| Prosecutor: | Actually, Your Honor, that's Good Friday. It's a county holiday. Sorry. |
| The Court: | No, thanks for telling me now. What does Thursday, then, April 1st look like for you? |
| Defense counsel: | That will be fine also. |
| The Court: | Okay. Let's make it Thursday, April 1, 9:00 o'clock. . . . |

The trial court then advised Smith's counsel "to make requests for any of the subpoenas you want and we'll get those issued and served," apparently referring to the multiple witnesses Smith was planning to call. The trial court added, "[T]he further in advance, the more advantageous it is to you especially with that number of people." The proceedings were then recessed until the April 1, 2010 trial.

On the above record, we cannot conclude that the trial court abused its discretion in concluding that Smith failed to carry her burden to show an absence of adverse consequences from the withdrawal of her waiver. Smith asserts on appeal that her request was made "sufficiently in advance of trial (which was scheduled for April 1, 2010) so as to pose no interference with the orderly administration of the business of the court, no unnecessary delay or inconvenience to the witnesses, and no prejudice to the State." Smith's difficulty in showing an abuse of discretion begins

16

with the fact that Smith never raised these arguments in the court below. In fact, Smith made no argument at all in support of her motion to withdraw, nor did she present any evidence in support of her motion. Smith simply requested withdrawal of the waiver and, when the trial court denied the request, dropped the matter entirely. Thus, in order for us to hold that the trial court abused its discretion in denying Smith's request, we would have to find that the withdrawal would not have interfered with the orderly administration of the business of the trial court, that it would not have delayed or inconvenienced the witnesses, and that it would not have prejudiced the State, despite the absence of any evidence in the record to support such findings. In essence, we would be doing what the court of criminal appeals has instructed us not to do—placing the burden on the State or the trial court to demonstrate that the withdrawal would have adverse consequences, and finding an abuse of discretion in the absence of such proof. *See Hobbs*, 298 S.W.3d at 197; *Marquez*, 921 S.W.2d at 222-23.

In any event, the record would support the trial court's implied finding of prejudice. Specifically, the record would support a finding that withdrawal would have interfered with the orderly administration of the business of the court. The record reflects that Smith first appeared in court to answer the State's charges in April 2008. Thus, at the time Smith requested withdrawal of her waiver, in late January 2010, the matter had been pending on the trial court's docket for almost two years. In that time, the record reflects that Smith had been granted multiple continuances, two different attorneys had been appointed to represent her (in addition to her current retained counsel), and the trial had been reset twice (the trial had first been scheduled for May 19, 2009, and then for October 23, 2009). To allow Smith to withdraw her jury waiver at that time would have further delayed the trial. As the court noted at the January pretrial hearing, its schedule was already

17

full through March, and a jury trial would have occurred even later than the April 1 bench trial that the court was able to accommodate. Moreover, although only two witnesses ultimately testified during trial (Ferry and Smith), at the time of the January pretrial hearing, the trial court had been informed by the parties that more witnesses could be called. The prosecutor had represented that "maybe two officers" would be called but added, "I don't think there's more than that," thereby implying that the State could call more witnesses. At the same time, defense counsel had represented that Smith had "ten witnesses" and that the trial could take "a day or two." Thus, at the time the trial court denied Smith's request to withdraw her jury waiver, it was under the impression that the trial could involve more witnesses and take more time than what it earlier had been led to believe. Based on this, the trial court could have reasonably determined that moving the case to its jury docket would have caused additional interference with the business of the court. And at both the October and January pretrial hearings, the trial court made references to how long the trial had already been delayed and its desire to resolve the case as expeditiously as possible. Thus, it appears that when the trial court denied Smith's request, it did not do so arbitrarily or capriciously but with due regard for the amount of time the case had been pending on its docket.

On this record, we cannot conclude that the trial court abused its discretion in denying Smith's request to withdraw her jury waiver. *See Marquez*, 921 S.W.2d at 223 ("The control of the business of the court is vested in the sound discretion of the trial judge.") (citing *Wheatfall v. State*, 882 S.W.2d 829 (Tex. Crim. App. 1994)); *Taylor*; 255 S.W.3d 401-02 (finding no abuse of discretion in denying withdrawal of jury waiver when record revealed that withdrawal of waiver would "wreck" court's docket and "interfere with the orderly administration of the business of the court"). We overrule Smith's first issue.

**Legal sufficiency**

In her second and third issues, Smith asserts that the evidence is legally insufficient to sustain her conviction and that the trial court erred in denying her motion for a directed verdict.[6] Because both issues ultimately raise the same legal-sufficiency complaint, we will address them together. *See McDuff v. State*, 939 S.W.2d 607, 613 (Tex. Crim. App. 1997) ("Since a complaint about overruling a motion for directed/instructed verdict is in actuality an attack upon the sufficiency of evidence to sustain the conviction, we shall address and dispose of [these] points . . . together."); *see also Cook v. State*, 858 S.W.2d 467, 470 (Tex. Crim. App. 1993) (holding that because challenge to trial court's ruling on motion for instructed verdict is in actuality challenge to sufficiency of evidence, "we will consider the evidence presented at trial by both the State and appellant").

In reviewing the sufficiency of the evidence to support a criminal conviction, we consider all the evidence in the light most favorable to the judgment and determine whether, based on that evidence and reasonable inferences to be drawn therefrom, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *see Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007). In a bench trial, the trial court is the sole judge of the credibility of witnesses and may accept or reject any part of

---

[6] We note that, technically speaking, because this was a bench trial, there was no "verdict" to direct. *See State v. Lewallen*, 927 S.W.2d 737, 739 n.2 (Tex. App.—Fort Worth 1996, no pet.). However, the word "verdict" is "used loosely in the statutes and case law." *Id*. (citing *State v. Davenport*, 866 S.W.2d 767, 769 (Tex. App.—San Antonio 1993, no pet.) (Onion, J.)).

their testimony. *Johnson v. State*, 571 S.W.2d 170, 173 (Tex. Crim. App. 1978). The trier of fact "is in the best position to judge the credibility of a witness because it is present to hear the testimony, as opposed to an appellate court who relies on the cold record." *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008).

"Reviewing courts are not fact finders. Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the essential elements of the offense beyond a reasonable doubt." *Allen v. State*, 249 S.W.3d 680, 688 (Tex. App.—Austin 2008, no pet.) (Onion, J.). When faced with conflicting inferences, a reviewing court must presume that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution. *Jackson*, 443 U.S. at 326; *Turro v. State*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993). If any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we must uphold the finding of guilt. *See McDuff*, 939 S.W.2d at 614; *Cuong Quoc Ly v. State*, 273 S.W.3d 778, 781 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd).

As charged, a person commits the offense of failure to identify-fugitive from justice if the person intentionally gives a "false" or "fictitious" name to a peace officer who has lawfully detained or arrested the person and the person is a "fugitive from justice" at the time of the offense. *See* Tex. Penal Code Ann. § 38.02(b), (d).[7] A "fugitive from justice" is defined as "a person for whom a valid arrest warrant has been issued." *Id.* § 38.01(5) (West 2011). Furthermore, the court of criminal appeals had held that an additional element of the offense, implicit in the statute, is that the person who falsely identifies herself must know that the person requesting the identification is a

---

[7] A person may also commit the offense by providing a "false" or "fictitious" residence address or date of birth. Tex. Penal Code Ann. § 38.02(b). However, Smith was charged only with providing a false or fictitious name.

peace officer. *See Green v. State*, 951 S.W.2d 3, 4 (Tex. Crim. App. 1997) (citing *Ledesma v. State*, 677 S.W.2d 529, 532 (Tex. Crim. App. 1984)).

The only element of the offense that Smith challenges on appeal is whether the name she provided to Ferry was "false" or "fictitious" within the meaning of the statute. As an initial matter, we observe that only Smith's conduct during her second encounter with Ferry[8] is relevant to our analysis because this was the sole occasion in which Ferry had detained her, an essential element of the offense. *See* Tex. Penal Code Ann. § 38.02(b).

Smith's central contention is that "Jay Smith" is neither a "false" nor "fictitious" name, but a truthful reflection of a moniker by which she has actually been known, both professionally and personally, for many years. The State does not dispute these facts, but insists they are irrelevant because it remains that "Jay Smith" is "false" and "fictitious" in the sense that it is not Smith's "legal and true name."

Underlying the parties' competing contentions is a dispute regarding the proper construction of "false" and "fictitious" in the context of the failure-to-identify statute. *Cf. Overshown v. State*, 329 S.W.3d 201, 207 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (construing meaning of phrase "lawfully detained" in context of section 38.02 in context of evidentiary sufficiency challenge). In essence, Smith views "falsity" or "fictitiousness" as a function of whether the name a defendant provides law enforcement is one that he or she actually uses, as opposed to one that is simply fabricated. It follows, in Smith's view, that an accurate representation

---

[8] I.e., when Ferry returned to investigate Smith's 911 calls and outstanding warrants.

21

of an established nickname—like "Jay Smith" or "Trey Hicks"[9]—would not be "false" or "fictitious" as a matter of law. Conversely, the State seems to suggest that any name other than the defendant's legal name would be "false" and "fictitious" by definition. We conclude that the correct construction of "false" or "fictitious" lies between these categorical positions.

The legislature has provided specific guidelines for construing statutes within the penal code. First, "[t]he rule that a penal statute is to be strictly construed does not apply to this code." Tex. Penal Code Ann. § 1.05(a) (West 2011). Instead, "[t]he provisions of this code shall be construed according to the fair import of their terms, to promote justice and effect the objectives of the code."[10] Id. These objectives include "to insure [sic] the public safety," "to give fair warning of what is prohibited and of the consequences of violation," "to safeguard conduct that is without guilt from condemnation as criminal," and "to guide and limit the exercise of official discretion in law enforcement to prevent arbitrary or oppressive treatment of persons suspected, accused, or convicted of offenses." Tex. Penal Code Ann. § 1.02 (West 2011). Additionally, "[u]nless a different construction is required by the context, Sections 311.011, 311.012, 311.014, 311.015, and 311.021 through 311.032 of Chapter 311, Government Code (Code Construction Act), apply to the construction of this code." Id. § 1.05(b).

When construing a statute, "we seek to effectuate the 'collective' intent or purpose of the legislators who enacted the legislation." Boykin v. State, 818 S.W.2d 782, 785 (Tex. Crim.

---

[9] Or, as was observed during oral argument, "Woodie" (J. Woodfin) Jones or "Bob" (Robert H.) Pemberton.

[10] In contrast, "criminal statutes outside the penal code must be construed strictly, with any doubt resolved in favor of the accused." State v. Rhine, 297 S.W.3d 301, 309 (Tex. Crim. App. 2009); State v. Johnson, 219 S.W.3d 386, 388 (Tex. Crim. App. 2007).

App. 1991) (citing *Camacho v. State*, 765 S.W.2d 431 (Tex. Crim. App 1989)). "When attempting to discern this collective legislative intent or purpose, we necessarily focus our attention on the literal text of the statute in question and attempt to discern the fair, objective meaning of that text at the time of its enactment." *Id*. "Thus, if the meaning of the statutory text, when read using the established canons of construction relating to such text, should have been plain to the legislators who voted on it, we ordinarily give effect to that plain meaning." *Id*. "'Where the statute is clear and unambiguous, the Legislature must be understood to mean what it has expressed, and it is not for the courts to add or subtract from such a statute.'" *Id*. (quoting *Coit v. State*, 808 S.W.2d 473, 475 (Tex. Crim. App. 1991)).

Further, "we may presume that each word in the statute has a purpose, and that words not defined in the statute are used in their ordinary and common sense." *Prudholm v. State*, 333 S.W.3d 590, 594 (Tex. Crim. App. 2011); *see* Tex. Gov't Code Ann. § 311.011(a) (West 2005) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage."); Tex. Gov't Code Ann. § 311.021(2) (West 2005) ("In enacting a statute, it is presumed that . . . the entire statute is intended to be effective.").

The words "false" and "fictitious" are not defined in the statute, so we must give them their ordinary and common meaning. In determining the ordinary and common meaning of an undefined word in a statute, we may consider dictionary definitions. *See Ex parte Rieck*, 144 S.W.3d 510, 512 (Tex. Crim. App. 2004); *Lane v. State*, 933 S.W.2d 504, 515, 515 n.12 (Tex. Crim. App. 1996); *Bingham v. State*, 913 S.W.2d 208, 209-10 (Tex. Crim. App. 1995). A review of such authorities consistently reflects that "false" commonly means "not true" and may encompass an

23

intent to deceive.[11] "Fictitious," in common usage, often refers to something that is "not real" or "imaginary," and likewise may include an intent to deceive.[12]

Within the context of section 38.02, it is also significant that the statutorily prohibited conduct (giving a "false" or "fictitious" name under the circumstances described) is immediately preceded by the word "intentionally," which denotes that the culpable mental state is connected with the conduct itself. *Cf. Schultz v. State*, 923 S.W.2d 1, 2 (Tex. Crim. App. 1996) (making similar observation regarding child-abandonment statute). "A person acts intentionally, or with intent, with respect to the nature of his conduct . . . when it is his conscious objective or desire to engage in the conduct . . . ." Tex. Penal Code Ann. § 6.03(a) (West 2011). Combining the two elements, there must be sufficient evidence that it was Smith's conscious objective or desire to give Ferry a

_____

[11] *See, e.g.*, *Webster's Third New Int'l Dictionary* 819 (2002) (defining "false" as "not corresponding to truth or reality: not true"; "intentionally untrue: lying"; "speaking falsehood: not truthful: dishonest, deceitful"; "made or tampered with to deceive"; "tending to mislead: deceptive, illusory"; "being other than what is purported or apparent: assumed or designed to deceive: not genuine or real"); *Merriam Webster's Collegiate Dictionary* 418 (10th ed. 2000) (defining "false" as "not genuine"; "intentionally untrue"; "adjusted or made so as to deceive"; "intended or tending to mislead"; and "not true"); *Random House Dictionary of the English Language* 695 (2d ed. 1987) (defining "false" as "not true or correct; erroneous"; "uttering or declaring what is untrue"; and "tending to deceive or mislead; deceptive"). In fact, the word "false" traces back to the Latin word *falsus*, the past participle of *fallere*, which means "to deceive." *See American Heritage Dictionary* 473 (1973); *Compact Edition of the Oxford English Dictionary* 956 (1973).

[12] *See, e.g.*, *Webster's Third New Int'l Dictionary* 844 (defining "fictitious" as "of, relating to, or suggestive of fiction or a fiction: imaginary" and noting that the word "applies to fabrication or contrivance, without necessary intent to deceive, or to false evaluation"); *Merriam Webster's Collegiate Dictionary* 431 (noting that "[f]ictitious implies fabrication and suggests artificiality or contrivance more than deliberate falsification or deception"); *Random House Dictionary of the English Language* 713 (defining "fictitious" as "created, taken, or assumed for the sake of concealment; not genuine; false: fictitious names"; and "of, pertaining to, or consisting of fiction; imaginatively produced or set forth; created by the imagination"); *American Heritage Dictionary* 488 (defining "fictitious" as "of, pertaining to, or characterized by fiction; nonexistent, imaginary; unreal" and "purposefully deceptive; false; untrue: a fictitious name").

24

"false" name (i.e., one that is not "true" to deceive him) or a "fictitious" name (one that is "imaginary" or "not real" to deceive him). Consequently, the "falsity" or "fictitiousness" of a name will turn largely on the speaker's intent and the context in which the name is used rather than on the categorical rules suggested by the parties. *Cf. Rajappa v. State*, 408 S.E.2d 163, 164-65 (Ga. Ct. App. 1991) (defendant identified herself to law enforcement officer using purported nickname; evidence sufficient to prove that name was false based on circumstances tending to show defendant had intent to deceive officer).

In this case, we conclude that the evidence of Smith's intent and surrounding circumstances were legally sufficient to establish that she intentionally gave Ferry a "false" name with the intent to deceive, if not also a "fictitious" name, during their second encounter. During that encounter, according to Ferry, he specifically advised Smith that she was "detained." He then requested her name. She said "Jay Smith." Ferry then inquired whether "Jay Smith" was the name on her driver's license, and she answered that it was. It was undisputed that "Jay Smith" was not the name on her driver's license. Although Smith was not charged with misstating the name on her driver's license, per se, as Smith emphasizes, her conduct is nonetheless probative of her intent to deceive Ferry regarding her true name and identity. There was also evidence that Smith had a motive to mislead Ferry regarding her true name and identity—Ferry had just informed her that she was being detained, and she had outstanding warrants in connection with other charges.[13] Smith's intent to deceive can be further inferred by contrasting her conduct with her admissions that, when applying for apartments, she had provided her legal name because she had understood that using variants could impede criminal record and credit checks. Viewing this evidence in the light most favorable

---

[13] According to Ferry's testimony, at the time he asked Smith whether the name on her driver's license was "Jay Smith," he had not yet revealed to her his awareness of the warrants.

25

to the prosecution, the trial court could have reasonably inferred that Smith, by providing Ferry with a name other than the name on her driver's license, had hoped to delay or even prevent Ferry from discovering the outstanding warrants issued under her legal name. And, even though Smith claimed that the reason she had provided the name "Jay Smith" to Ferry was not to deceive him but "[o]ut of habit for doing it for 17 years," the trial court was free to find this testimony not credible. The trial court was also free to find not credible Smith's testimony that she had no knowledge of the outstanding warrants, particularly in light of the evidence tending to show that Smith had been in contact with the municipal court regarding the payment of outstanding fines, that the warrants had been outstanding for several months prior to her arrest, and that the mailing address listed on the warrants was in fact Smith's mailing address.

In sum, this evidence is legally sufficient to establish that Smith, in persisting in identifying herself as "Jay Smith" rather than her legal name under the circumstances described, intentionally gave Ferry a false name. We overrule Smith's second and third issues.

## CONCLUSION

We affirm the judgment of the trial court.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Henson

Affirmed

Filed: January 20, 2012

Publish

26