# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00681-CR

**Richard Jerry Breuer, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF BELL COUNTY, 27TH JUDICIAL DISTRICT
## NO. 69844, HONORABLE MARTHA J. TRUDO, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Richard Jerry Breuer of the offense of aggravated assault with a deadly weapon on a public servant.[1] Punishment was assessed at twenty years' imprisonment. In two points of error on appeal, Breuer asserts that the evidence is insufficient to support his conviction and that the district court abused its discretion in denying his motion for new trial based on a claim of ineffective assistance of counsel. We will affirm the judgment of conviction.

## BACKGROUND

The jury heard evidence that on April 6, 2012, Breuer had shot Jimmy Smitherman during an incident at Breuer's home in East Bell County. The incident also involved Breuer's then-wife, Machele, who had formerly resided in the home but had since become estranged, departed the home, and begun a dating relationship with Smitherman. By the time of the incident, Machele and

---

[1] *See* Tex. Penal Code § 22.02(b)(2)(B).

Smitherman had decided to move in together and had found a rental house in the nearby town of Buckholts. However, some of Machele's belongings still remained in the home she had shared with Breuer. Prior to going to retrieve them, according to Machele, she had spoken by phone with Breuer, who had indicated that he was out of town. During that same phone conversation, Machele added, she had informed Breuer that she would be going to the home to "get some of her stuff." Smitherman, who had overheard the phone conversation, testified that Breuer had responded, "Okay. Don't touch none of my stuff and [] make sure you feed the animals while you're there." With that prologue, Machele, with Smitherman accompanying her, had driven her pickup truck to Breuer's home on April 6 to retrieve her possessions. To summarize the ensuing events, it turned out that Breuer was in the home when they arrived, violence erupted, and the State sought to portray Breuer's actions as evidencing a murder-suicide plot.

At all relevant times, Smitherman has served as an officer with the Police Department of the City of Rogers,[2] and the key contested issues at trial included not only competing accounts of the violence but Breuer's awareness of Smitherman's law-enforcement status and whether the officer had been acting within his official duties at the time of the incident. Machele testified that she had previously informed Breuer, shortly after she had started dating Smitherman, that she was dating another man who was a police officer. On the other hand, it is undisputed that Smitherman was off-duty at the time he accompanied Machele to Breuer's home. Smitherman recounted that he was wearing "civilian clothes; blue jeans, boots,[and a] t-shirt." He was, however, armed and wearing his police badge on his belt directly in front of his weapon, in compliance with police department

---

[2] Smitherman indicated, in fact, that he first met Machele while on patrol, when he found her sleeping in her vehicle in a Rogers parking lot after having fled the home she had shared with Breuer.

policy that required officers to carry a firearm and police identification during off-duty hours. Further, the t-shirt had a police-badge logo printed on a left front pocket, with the text of a common prayer in aid of law enforcement printed on the back.

When the pair arrived at Breuer's home, Machele proceeded inside while Smitherman waited outside in her truck. Machele testified that upon entering the bedroom, she "saw the barrel of a .9mm" pointed at her by Breuer, who screamed at her, "Who do you think you are?" According to Machele, Breuer then grabbed her by her hair, forced her down on her knees, and pointed the gun at her head. Machele recounted, "I was pushing [the gun] away. He grabbed my hair harder. He let go of it. He cocked the gun. He pulled the slide back and he said, 'You're not leaving this house alive. I'll see you in a minute.'"

Machele added that she, believing that Breuer was about to kill her, screamed for Smitherman, yelling, "Jimmy, Jimmy, he has a gun." At that moment, Machele indicated, she noticed Breuer's "eyes change[]," whereupon he grabbed her by the hair again and dragged her into the living room. By that time, Machele claimed, she could hear Smitherman coming up the front steps to enter the home and saw Smitherman "push[] the door open with his foot." Then, according to Machele, she heard Smitherman say, "Police officer, drop the gun, drop the gun." Machele testified that Breuer did not drop his weapon. Instead, she explained, "He doesn't even hesitate. He just started pulling the trigger."

According to Machele, she witnessed Smitherman being hit by a bullet and retreating backwards down the steps, with Breuer advancing toward and through the front entry door, "still firing the gun." Machele claimed she followed Breuer in an attempt to stop him and, through the front entry, "could see Jimmy laying on his stomach in front of the truck." Breuer proceeded down

the steps and, according to Machele, told Smitherman, "I don't care if you're a fucking cop, you will fall like the rest of us," proceeded to the fallen Smitherman, and stood over the officer pointing the gun at him. Believing that Breuer was "going to shoot him again." Machele claimed that she pushed Breuer away from Smitherman, deterring Breuer momentarily and enabling her and Smitherman to flee into her truck. However, Machele had left her keys—including her truck's ignition key—in the front door of the house, preventing the pair from leaving the scene in the vehicle.

With Breuer continuing to shoot at them, Machele claimed, she exited the truck, ran back to the front door of the home, retrieved her keys, made it back to the truck, and cranked the engine. She further recalled that one of Breuer's shots went through the truck's windshield, hitting Smitherman above his chest. As Machele attempted to put the truck in reverse, with Breuer continuing his shooting, Smitherman was able to fire a shot from his weapon at Breuer, hitting him in what appeared to be the side of his body. At that point, Machele was able to drive away. Both Smitherman and Breuer subsequently received medical attention for their injuries and survived.

Smitherman also testified and generally echoed Machele's account of the incident. He explained that after hearing Machele's screams for help, he had unholstered his weapon, approached the house, and observed Breuer pulling Machele by the hair. Smitherman testified that he told Breuer twice, "I'm a police officer, drop the gun. Police officer, drop the gun." Immediately thereafter, Smitherman recalled, Breuer "opened fire" and shot him, hitting him "more than once." Smitherman then described the events leading to their escape from Breuer's house in a manner largely consistent with Machele's testimony.

Breuer testified in his defense and admitted that he shot Smitherman, but denied that the shooting had occurred in the manner described by Machele and Smitherman. According to

4

Breuer, he had been sleeping in the bedroom when he heard someone open the front door and say, "Jimmy, Jimmy." When Breuer got out of bed and exited his bedroom, he saw through his front door "a gentleman at the bottom of my stairs holding a pistol on me." Breuer ran back to the bedroom, grabbed his pistol, returned to the living room, and "just started firing" at the man at the front door. Breuer denied that the man had ever stated that he was a police officer or that Breuer had perceived him to be. To the contrary, according to Breuer, he had believed the person to be a hit man sent by Machele, whom he claimed had threatened to kill him earlier that week. Thus, Breuer sought to portray his actions as self-defense.

Of final note regarding the evidence at trial, Machele testified that she had returned to Breuer's home several days after the incident, after he was safely in custody, to continue gathering her personal belongings. While there, Machele testified, she discovered a note written by Breuer prior to the incident.[3] Machele provided that note to law enforcement. At trial, the State offered the note as evidence to support its theory that Breuer had planned a murder-suicide. The note was admitted without objection.

---

[3] The note reads:

To whom it may concern

Well its happened again Im loosing everything my wife whom I love with all my heart and soul and my kids [] who I wish I was there real dad but Im not. I love them so much. I always mess everything up over and over and over. My wife is leaving me for another man. I guess this is what I deserve. Im a failer at everything I do. Some people are ment to be happy and then theirs me. I lived long enough in sadness. Now the end is near I just want to tell my brothers and sisters that I love them and to my wife I hope that he makes you happy because I couldn't. It wasn't meant to be. I will miss everybody but I have nothing.

(Grammatical and spelling errors in original). Breuer acknowledged that he did in fact write the note but disputed the State's characterization of it as reflecting his intent to commit suicide.

After hearing the evidence, the jury found Breuer guilty as charged and assessed punishment as indicated above. Subsequently, Breuer filed a motion for new trial, arguing that he had been denied effective assistance of counsel. Following a hearing, the trial court denied the motion. This appeal followed.

## ANALYSIS

**Legal sufficiency**

In his first point of error, Breuer asserts that the evidence is insufficient to support his conviction.[4] In reviewing the sufficiency of the evidence to support a criminal conviction, we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences to be drawn therefrom, a rational jury could have found the essential elements of the crime beyond a reasonable doubt.[5] This standard gives full play to the responsibility of the jury to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.[6] "A reviewing court determines whether the necessary inferences are reasonable based upon the combined and cumulative force of all

---

[4] More precisely, Breuer claims that the district court erred in denying his motion for directed verdict, but this is substantively a challenge to the sufficiency of the evidence. *See Canales v. State*, 98 S.W.3d 690, 693 (Tex. Crim. App. 2003); *Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996); *Madden v. State*, 799 S.W.2d 683, 686 (Tex. Crim. App. 1990); *Grayson v. State*, 82 S.W.3d 357, 358 (Tex. App.—Austin 2001, no pet.).

[5] *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Smith v. State*, 363 S.W.3d 761, 773 (Tex. App.—Austin 2012, pet. ref'd).

[6] *Jackson*, 443 U.S. at 319; *see Hooper v. State*, 214 S.W.3d 9, 15-16 (Tex. Crim. App. 2007).

6

the evidence when viewed in the light most favorable to the verdict."[7] "When the record supports conflicting inferences, a reviewing court must presume that the fact finder resolved the conflicts in favor of the prosecution and defer to that determination."[8]

A person commits the offense of aggravated assault with a deadly weapon if the person intentionally, knowingly, or recklessly causes serious bodily injury to another and the person uses or exhibits a deadly weapon during the commission of the assault.[9] The offense is a first-degree felony if "the offense is committed . . . against a person the actor knows is a public servant while the public servant is lawfully discharging an official duty."[10] Here, Breuer does not dispute that the evidence is sufficient to prove that he intentionally caused seriously bodily injury to Smitherman by shooting him with a firearm. The only element Breuer challenges on appeal is the additional requirement that the offense be committed against "a person the actor knows is a public servant while the public servant is lawfully discharging an official duty." Specifically, Breuer contends that the evidence is insufficient to prove that (1) Smitherman was "lawfully discharging an official duty" at the time of the shooting and (2) that Breuer knew Smitherman was a law-enforcement officer. We disagree.

Smitherman testified that he has served as a police officer for the City of Rogers at all relevant times. Therefore, he is, by definition, a peace officer.[11] And even assuming that

---

[7] *Garcia v. State*, 367 S.W.3d 683, 687 (Tex. Crim. App. 2012) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)).

[8] *Id*. (citing *Jackson*, 443 U.S. at 326).

[9] Tex. Penal Code §§ 22.01(a)(1), .02(a).

[10] *Id*. § 22.02(b)(2).

[11] *See* Tex. Code Crim. Proc. art. 2.12(3).

Smitherman was beyond the jurisdiction served by the Rogers Police Department at the time of the incident, a peace officer who is outside his jurisdiction may arrest, without a warrant, a person who commits a felony offense within the officer's presence or view.[12] Moreover, a city police officer (as Smitherman is) who is outside of his jurisdiction may arrest without a warrant a person who commits any non-traffic offense committed within the officer's presence or view.[13] Additionally, "a police officer's 'off-duty' status is not a limitation upon the discharge of police authority in the presence of criminal activity."[14] Thus, Breuer's contention that an officer is not lawfully discharging an official duty merely because he is off-duty at the time he responds to criminal activity "is based on a faulty premise."[15] Simply put, when an off-duty police officer takes action to stop criminal activity, "the officer [is] no longer off duty."[16]

Here, Smitherman testified that he heard Machele yell, "Oh my God, Jimmy, he's got a gun. Jimmy, he's got a gun." At that point, Smitherman exited the truck, approached the house, and observed, inside the house, Breuer "pulling [Machele] by the hair" and Machele "struggling trying to get away from him." Smitherman testified that his official duties required him to stop a

---

[12] *Id*. art. 14.03(d).

[13] *See id*. art. 14.03(g)(2); *see also York v. State*, 342 S.W.3d 528, 535-36 (Tex. Crim. App. 2011); *Hoitt v. State*, 28 S.W.3d 162, 166-68 (Tex. App.—Texarkana 2000), *pet. dism'd, improvidently granted*, 65 S.W.3d 59 (Tex. Crim. App. 2001).

[14] *Wood v. State*, 486 S.W.2d 771, 774 (Tex. Crim. App. 1972); *Polk v. State*, 337 S.W.3d 286, 288 (Tex. App.—Eastland 2010, pet. ref'd).

[15] *See Wood*, 486 S.W.2d at 774.

[16] *Hafdahl v. State*, 805 S.W.2d 396, 401 (Tex. Crim. App. 1990). Thus, the court of criminal appeals has observed that an officer, at least in this regard, is "on duty 24 hours a day." *Monroe v. State*, 465 S.W.2d 757, 759 (Tex. Crim. App. 1971); *see Hafdahl*, 805 S.W.2d at 401; *Polk*, 337 S.W.3d at 288.

felony when it happens in his sight and that he had acted in accordance with those duties. From this and other evidence, a rational jury could reasonably infer that Smitherman had witnessed Breuer committing offenses that included and were not limited to assault—family violence and aggravated assault with a deadly weapon and that Smitherman was lawfully discharging an official duty in attempting to stop their commission.[17]

We similarly reject Breuer's contentions regarding his knowledge of Smitherman's status as a law-enforcement officer. Although Breuer insisted that he had not been aware that Smitherman was a police officer, the jury heard contrary testimony from both Machele and Smitherman. Both concurred that Smitherman had identified himself as a police officer before Breuer shot him—in fact, Smitherman testified that he had done so twice—and Machele recounted that Breuer had even demonstrated his awareness of that fact in exclaiming, "I don't care if you're a fucking cop, you will fall like the rest of us." From this and other evidence, a rational jury could reasonably infer that Breuer knew Smitherman was a police officer at the time he shot him.[18]

---

[17] *See Hafdahl*, 805 S.W.2d at 401 (holding officer was no longer off-duty after he identified himself to offender and instructed him to halt following accident); *Selvage v. State*, 680 S.W.2d 17, 19 (Tex. Crim. App. 1984) (holding off-duty deputy sheriff assumed role of peace officer when, after being notified by store owner of suspicious behavior, he revealed his badge and service weapon to defendants); *Polk*, 337 S.W.3d at 287-88; (holding officer ceased to be off-duty and assumed the role of peace officer when he began to investigate potential criminal activity); *Hoitt*, 28 S.W.3d at 165 (holding officer that witnessed defendant commit a felony was "public servant" despite being outside of his jurisdiction).

[18] *See Polk*, 337 S.W.3d at 288-89 (holding evidence sufficient to prove that defendant knew individual was peace officer despite conflicting testimony regarding whether individual was in uniform and had identified himself as a police officer at time of assault); *Lavern v. State*, 48 S.W.3d 356, 359-60 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd) (holding evidence was sufficient to prove that defendant knew individual was peace officer even though officer was not in uniform, and initially denied being an officer, where evidence showed defendant accused him of being an officer and, after a gun battle erupted, the officer properly identified himself); *see also Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996) ("[R]econciliation of conflicts in the evidence is within the exclusive province of the jury.").

Viewing the above evidence in its totality and in the light most favorable to the verdict, we conclude that the evidence is sufficient to prove that Breuer committed the offense of aggravated assault with a deadly weapon on a public servant.

We overrule Breuer's first point of error.

**Ineffective assistance**

In his second issue, Breuer contends that the trial court erred in not granting his motion for new trial based on a claim of ineffective assistance of counsel. The standard of review for claims of ineffective assistance of counsel is well-established.[19] Breuer must demonstrate, by a preponderance of the evidence, not only that counsel's performance was deficient, i.e., it fell below an objective standard of reasonableness, but also that there is a reasonable probability that, but for the deficiency, the result of the proceeding would have been different.[20]

We review a trial court's denial of a motion for new trial for abuse of discretion.[21] This includes motions for new trial based on claims of ineffective assistance.[22] Accordingly, in this case, we do not apply the aforementioned *Strickland* test de novo.[23] Rather, we review the trial court's application of the *Strickland* test under the abuse-of-discretion standard.[24] "We do not

---

[19]  *See Strickland v. Washington*, 466 U.S. 668, 690-91, 693-96 (1984); *Perez v. State*, 310 S.W.3d 890, 892-93 (Tex. Crim. App. 2010); *Hernandez v. State*, 726 S.W.2d 53, 55-57 (Tex. Crim. App. 1986); *Kuhn v. State*, 393 S.W.3d 519, 537 (Tex. App.—Austin 2013, pet. ref'd).

[20]  *See Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999).

[21]  *Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004).

[22]  *See Okonkwo v. State*, 398 S.W.3d 689, 694 (Tex. Crim. App. 2013).

[23]  *Id*. at 695-97; *Ramirez v. State*, 301 S.W.3d 410, 415 (Tex. App.—Austin 2009, no pet.).

[24]  *Okonkwo*, 398 S.W.3d at 695; *Ramirez*, 301 S.W.3d at 415.

10

substitute our judgment for that of the trial court, but rather we decide whether the trial court's decision was arbitrary or unreasonable."[25] "We must view the evidence in the light most favorable to the trial court's ruling and presume that all reasonable factual findings that could have been made against the losing party were made against that losing party."[26] "Thus, a trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling."[27]

Breuer's ineffective-assistance claim on appeal is rooted solely in his trial counsel's decision not to oppose the admission of what the State characterized as a "suicide note" written by Breuer. More specifically, Breuer complains that his trial counsel (1) failed to proceed on a pretrial motion to suppress the note that had been filed by earlier counsel—the Hon. Bill Torrey, now the Milam County District Attorney—prior to Mr. Torrey's election to that office and subsequent withdrawal from representation; and (2) failed to object to the note's admission at trial as more unfairly prejudicial than probative.[28] On this record, we cannot conclude that the district court would have abused its discretion in finding that trial counsel's performance did not fall below an objective standard of reasonableness in either instance.

Regarding counsel's decision not to pursue the motion to suppress, Machele testified that she had discovered the note several days after the alleged offense had occurred. At the hearing on the motion for new trial, Breuer's trial counsel testified that Machele had provided that note

---

[25] *Charles*, 146 S.W.3d at 208.

[26] *Id*.

[27] *Id*.

[28] *See* Tex. R. Evid. 403.

11

directly to law enforcement officials. Thus, it turned out that the note was not the product of any search by the State. Given these and other circumstances, Breuer's trial counsel explained, he did not believe that he would have been successful in proceeding with the motion to suppress. The district court would not have abused its discretion in finding that counsel's decision declining to pursue the motion to suppress did not fall below an objective standard of reasonableness.

Regarding counsel's decision not to object to the admission of the note during trial, counsel testified that he had reviewed the note with his client and that they had decided it could be used to support the defense's theory that Breuer "wouldn't really have any motive to do [Machele] harm" because the note contains expressions of Breuer's love for her and wishes for her future happiness. Thus, counsel indicated a strategic motive for not objecting to the note, and the district court would not have abused its discretion in finding that pursuing this strategy did not fall below an objective standard of reasonableness. Additionally, having reviewed the note, we cannot conclude that the district court would have abused its discretion in finding that the note was not more unfairly prejudicial than probative. The note consists primarily of Breuer expressing feelings of sorrow and regret, and the reader could reasonably have viewed its contents as considerably less "inflammatory" as Breuer seems to. Thus, even if counsel had objected on the basis of Rule 403, we cannot conclude that the objection would have been sustained and the note excluded. The failure to object to admissible evidence does not constitute deficient performance.[29]

---

[29] *See, e.g., Ex parte White*, 160 S.W.3d 46, 53 (Tex. Crim. App. 2004); *Ortiz v. State*, 93 S.W.3d 79, 93 (Tex. Crim. App. 2002); *Jackson v. State*, 973 S.W.2d 954, 957 (Tex. Crim. App. 1998); *Muniz v. State*, 851 S.W.2d 238, 258 (Tex. Crim. App. 1993).

12

We cannot conclude on this record that the district court abused its discretion in denying the motion for new trial on the ground that Breuer failed to prove by a preponderance of the evidence that his counsel provided ineffective assistance.

We overrule Breuer's second point of error.

## CONCLUSION

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton, and Field

Affirmed

Filed:   August 29, 2014

Do Not Publish