

# NUMBER 13-23-00141-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**ALVARO R. GARCIA,**                                                    **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                  **Appellee.**

---

## ON APPEAL FROM THE 138TH DISTRICT COURT
## OF CAMERON COUNTY, TEXAS

---

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Silva
Memorandum Opinion by Justice Benavides**

A jury convicted appellant Alvaro R. Garcia of three counts of tampering with a governmental record with the intent to harm or defraud, state jail felonies. *See* TEX. PENAL CODE ANN. § 37.10(c)(1). The trial court imposed a two-year state jail sentence, suspended the sentence, and placed Garcia on community supervision for a period of

five years.[1] By five issues, Garcia argues: (1) the evidence was legally insufficient; (2) the convictions violate double jeopardy; (3–4) counsel rendered ineffective assistance of counsel; and (5) the cumulative effect of these errors constitutes reversible error. Because the evidence is insufficient to support the convictions, we reverse and render a judgment of acquittal on each of the three counts.

## I.  BACKGROUND

In April of 2018, Garcia was the Chief of Police for the Palm Valley Police Department. As part of a contract he signed with the Texas Municipal Police Association (TMPA), Garcia also taught continuing education courses to peace officers. The indictment in this case alleged that between April 23 and 25, 2018, Garcia entered false statements on three separate "Texas Commission on Law Enforcement (TCOLE) report[s] of training course #3264, . . . the false entries being Leofredo Pena,[2] Robert Mendiola, and Jolynn Morales . . . did physically attend the training course." The indictment further alleged that he submitted these false records to TMPA "with knowledge of [their] falsity and with intent that [they] be taken as . . . genuine governmental record[s] and with the intent to defraud [TMPA]."

At trial, Cody Lee Hunt, a former sergeant with the Palm Valley Police Department, testified that he learned from Mendiola, a fellow police officer, that Garcia taught a three-day sexual assault family violence investigators course (SAFVIC) that took place from

---

[1] As a condition of his community supervision, Garcia was required to spend three days in jail.

[2] Pena's name is spelled elsewhere in the record as "Peña." However, we will spell his name as it was most consistently spelled in the record.

April 23–25, 2018. Mendiola reportedly told Hunt that he "sign[ed] off on the roster for the three days and did take the test, but did not appear in the class." Mendiola also reportedly told Hunt "[t]hat they were told to do so by the chief because he needed enough people on the roster to get paid by the [Police] Academy." Hunt had concerns about the ethics of this, so he filed a complaint with TCOLE.

Reynaldo Olvera, a sergeant with TCOLE, explained that his state agency oversees the "licensing and training" of all police officers in Texas. According to Sergeant Olvera, TMPA has "an agreement with [TCOLE] that they're going to provide good instructors, provide certain . . . courses approved by us so they can teach training[,] and get credit training validated by our agency so the officer can be licensed for their training."

A copy of the contract executed between Garcia and TMPA was admitted into evidence. According to the contract, Garcia was required to, *inter alia*: (1) "[t]each and administer the SAFVIC curriculum to at least 10 students . . . on at least **one** occasion prior to **August 31, 2017**"; (2) "[s]ubmit to TMPA, the proper documentation for class participants within 10 days after completion of the course"; (3) "[r]eview and update material as necessary to ensure accurate and timely information is presented to each class"; (4) "[c]oordinate all programmatic logistics, such as teaching facilities, equipment, and guest speakers"; and (5) "[e]nsure that all SAFVIC curriculum objectives are taught and understood." In exchange, TMPA would, *inter alia*: (1) "assist [Garcia] in establishing a set of records that comply with the requirements of the [TCOLE] grant and periodically inspect such records to ensure they are properly kept"; (2) "[e]valuate instructor, student, and curriculum performance"; and (3) "[e]nsure all training records are current and

3

submitted to [TCOLE]." The contract also provided: "At least 10 students must register for any class. In the event less than 10 students begin the class, TMPA reserves the right to compensate the service provider at $85 per student who completes the 3-day SAFVIC class (Completion defined as full attendance and completion of the final examination)."

In investigating the complaint made in this case, Sergeant Olvera spoke to Mendiola, who told him:

> [Y]eah, I didn't go. I had to work. . . . Garcia[] allowed me to work, but he would come routinely to check up on me, provide the instruction, sit down with me two hours, provide the material, provide the testing, and allowed me to do that so I can work, cover my shift, and still be able to attend the course and get credit for the course.

When Sergeant Olvera asked Garcia about Mendiola's account, Garcia explained:

> I'm a police chief for a small department, I don't have a lot of staff. Mr. Mendiola had taken this course in the past so he's been in the classroom in the past. But since I needed officers in my agency[,] I didn't figure it was going to be bad because I believe in independent study . . . . I would come here twice a day for three days in a row, sit down with him, give him the instruction, give him the pamphlets, and at the end gave him the test and he passed.

Sergeant Olvera then spoke to Pena who said,

> Garcia was known to help the police officers that had to work, that couldn't go to the classes. He was known to help officers and give them courses and give them credit for it. And in [t]his instance he told me, don't worry. I'll help you. I'll come and sit down with you, I'll sit down with you like on a personal instruction, give you the course, give you the test, give you everything so you can get credit and get the hours that you need. And [Pena] admitted he didn't go to the course. He didn't attend.

Sergeant Olvera also spoke to Morales who "was very evasive," did not "remember taking the course," and "didn't want to answer [Sergeant Olvera's] questions."

According to Sergeant Olvera, "[i]n order for anybody, the instructor, to be able to

4

put this course [on], they have to have at least ten people assigned to it and attend . . . for them to get credit for the course and for the instructor to get paid." Sergeant Olvera believed that Garcia should be aware of the ten-person requirement "because as a police instructor he's required in his biography and his background to understand everything that he provides as an instructor. He has to understand the guidelines of the contract, . . . lesson plans of the course, what's required, what's not required." Sergeant Olvera testified that self-studying "obviously" did not comply with the course requirements as participants had to "attend personally." However, Sergeant Olvera agreed that there was nothing "in the materials that say[s] that an instructor can't allow self[-]study or somebody to be absent from the class."

Sergeant Olvera testified that Garcia submitted the reports to TMPA, "a private nonprofit organization," which then "submits th[em] to [TCOLE] through a form of records and it becomes official documentation. It becomes a government record." Three reports were admitted into evidence, each of which corresponded to a day of the course. Below

is State's Exhibit 1, which is the first of the three training reports.[3]

<table>
<tr><td colspan="12">TEXAS COMMISSION ON LAW ENFORCEMENT (TCOLE)<br>REPORT OF TRAINING</td></tr>
<tr><td>Page #<br>1</td><td>Course #<br>3264</td><td>Provider #<br>513-006</td><td>Course Hours<br>24</td><td>Beginning Date<br>4-23-18</td><td>Ending Date<br>4-25-18</td><td>Number of Students<br>Completed 10</td><td colspan="5">* Type: 1-TX P.O. Lic. 3-Lic. Telecom. 4-Elected, not lic. 5-County Jailer 6-Other, no TX. Lic.</td></tr>
<tr><td colspan="6">Course Title: Sexual Assault Family Violence Investigator Course</td><td colspan="6">Name of Provider: Texas Municipal Police Association</td></tr>
<tr><td>*Type</td><td>PID#</td><td colspan="2">Last Name, First Name M.I.</td><td>D.O.B.</td><td>*Type</td><td>PID#</td><td colspan="3">Last Name, First Name M.I.</td><td>D.O.B.</td></tr>
<tr><td>1</td><td></td><td colspan="2"></td><td></td><td></td><td></td><td colspan="3"></td><td></td></tr>
<tr><td>1</td><td></td><td colspan="2"></td><td></td><td></td><td></td><td colspan="3"></td><td></td></tr>
<tr><td>1</td><td></td><td colspan="2"></td><td></td><td></td><td></td><td colspan="3"></td><td></td></tr>
<tr><td>1</td><td></td><td colspan="2"></td><td></td><td></td><td></td><td colspan="3"></td><td></td></tr>
<tr><td>1</td><td></td><td colspan="2"></td><td></td><td></td><td></td><td colspan="3"></td><td></td></tr>
<tr><td>1</td><td></td><td colspan="2"></td><td></td><td></td><td></td><td colspan="3"></td><td></td></tr>
<tr><td>1</td><td></td><td colspan="2"></td><td></td><td></td><td></td><td colspan="3"></td><td></td></tr>
<tr><td>1</td><td></td><td colspan="2">Peña, Leonelo</td><td></td><td></td><td></td><td colspan="3"></td><td></td></tr>
<tr><td>1</td><td></td><td colspan="2">Mendiola, Robert</td><td></td><td></td><td></td><td colspan="3"></td><td></td></tr>
<tr><td>1</td><td></td><td colspan="2">Morales, Jolynn</td><td></td><td></td><td></td><td colspan="3"></td><td></td></tr>
<tr><td></td><td></td><td colspan="2"></td><td></td><td></td><td></td><td colspan="3"></td><td></td></tr>
<tr><td></td><td></td><td colspan="2"></td><td></td><td></td><td></td><td colspan="3"></td><td></td></tr>
<tr><td></td><td></td><td colspan="2"></td><td></td><td></td><td></td><td colspan="3"></td><td></td></tr>
<tr><td colspan="12">THESE STUDENTS HAVE COMPLETED THIS COURSE AND ARE APPROVED FOR CREDIT.</td></tr>
<tr><td colspan="6">Instructor (please print)<br>Alvaro Garcia</td><td colspan="6">Instructor Signature</td></tr>
<tr><td colspan="3">Training Coordinator (please type or print)<br>Bryan Flatt</td><td colspan="2">Signature of Training Coordinator</td><td>Date<br>05-3-18</td><td colspan="3">Phone #</td><td colspan="3">E-Mail</td></tr>
</table>

STATE'S EXHIBIT 1

Sergeant Olvera testified that this "attendance sheet [goes] to TMPA, [and] when it get[s] submitted to [TCOLE] it becomes an official record."

Bryan Flatt, the training coordinator for TMPA, testified that having "a daily sign-in roster" for each class "is a TCOLE requirement under the TCOLE rules in the Texas

---

[3] For the sake of privacy, we have altered the exhibit to omit the officers' personal identification numbers and dates of birth. Additionally, we have removed the names of the seven officers who were not named in the indictment and Bryan Flatt's contact information. The main difference between the three pages of reports is the page number in the upper left-hand corner.

6

Admin Code" and that "it's a requirement by TCOLE that you maintain your class files for five years."[4] Flatt explained that officers have to meet a continuing education requirement of "40 hours every two years." Typically, TMPA provides its course instructors with a "PowerPoint presentation" and "any handouts [for] whatever particular class it is." Flatt explained that the roster "is submitted to TCOLE via TCLEDDS [Texas Commission on Law Enforcement Data Distribution System], which is the data reporting system for training hours," and that once the roster is submitted, "that's when it's officially a government record." Flatt detailed that TCOLE requires students "to attend all sessions of every class. There's no minimum or max amount of time that can be missed. There's nowhere in the TCOLE rulebook that says that. It just says—not verbatim—that you have to attend all sessions, all hours, to receive credit for that class."[5] However, Flatt did not know whether self-studying was allowed under TCOLE's or TMPA's rules but believed it would depend on "the contract that was signed."

Mendiola testified that, although he did not physically attend the class, Garcia would instruct him "one-on-one" for "about roughly two hours a day" on the materials. In addition to this individual instruction, Mendiola would "study afterwards . . . at the P[olice] D[epartment]." Mendiola explained that he had attended "two or three" SAFVIC courses in the past, but he could not attend this class in-person because "it's not a big department so we didn't have enough people to cover the shifts." Mendiola testified that, "[a]t the

---

[4] No citation was provided, either below or on appeal, to any provision of the administrative code applicable to this case.

[5] TCOLE's rulebook was not admitted into evidence.

time," he did not believe he had done anything wrong, "[b]ecause [he] just took the class and took the test. That's it. It's not like [he] cheated. [He] took the test on [his] own." Mendiola also testified that he signed each of the three reports. Ultimately, Mendiola received a "92" on the final exam, which corresponds to an A.

TCOLE initially "took away" the twenty-four hours of claimed credit from Mendiola and informed him that the hours were improperly obtained. However, at some later point they reinstated the hours on his record.

Pena testified that Garcia told him he "could take the class on [his] own at home." Pena remembered spending "[a] lot" of time on this training because "[i]t was a long course." Like with Mendiola, Garcia spent about "two hours a day" with Pena over the course of three days. Pena explained, "Originally[,] I was supposed to attend in person, but I couldn't get away from work. So I told him I wasn't able to so he suggested or said that I could take it on my own. He gave me all the materials, all the instructions. So that's what I did." Pena "thought it was okay for [him] not to go" in person since Garcia made this allowance. Like Mendiola, TCOLE initially removed the hours of credit from his record but later reinstated them. Pena thought it was fair that he got credit for taking a course at home while others had to go to class because he "did all the work." Pena believed that the statement "Pena[] has completed this course and is approved for credit" was a "true" statement.

Pena agreed that he had taken this specific SAFVIC course several times before. Pena described Garcia as being "out there to help us out and he answers questions, he offers courses, he teaches classes. He's one of the go-to instructors amongst others that

8

are here in the Valley." Pena got a 90 on the final exam, also an A. Pena believed that he "completed the course."

Morales testified that in 2018, she was a reserve officer and needed to take the SAFVIC course in 2018 "to keep [her] license active," so she "reached out to [Garcia] . . . to take the class." However, because of a scheduling conflict, Morales "wasn't able to attend the actual training course. So he instructed [her that she] could pick up the pamphlet to test at home and then return it to him." Morales denied having any one-on-one training with Garcia and denied signing the sign-in sheet. Morales testified that when an investigation started, Garcia "told [her] that he would have somebody that was able to say he had people in the class that was able to vouch that [she] was in the class for two days."

Text messages exchanged between Garcia to Morales were admitted into evidence. In one of the messages, Garcia addressed the TCOLE complaint, stating,

> They haven't spoken to me yet abou[t] this but I will tell them the truth. That I gave [yo]u the booklet the week before so [yo]u could review since [yo]u were already . . . taking classes on the same campus during the day. And that [yo]u did come to class at least twice and I reviewed the material with you. People in class saw . . . you.

Morales testified that it was not true that she attended the class in person, so it seemed like Garcia was "covering something up," which is why Morales turned these text messages over to TCOLE. Morales acknowledged that on April 23rd, she went to the class to turn in some materials, testifying that she simply "handed [the form] to [Garcia] at the door and then [she] left." On April 23rd, via text message, she stated, "Ok sorry to have interrupted today," "I just wanted to make sure I turned it . . . [i]n," and "See you

tomorrow."

Morales agreed that Garcia gave her the materials, told her to study the materials, and relied on her to actually study them. And Morales agreed that she did, in fact, complete the course materials, passed the final examination with an A, and received credit for the class. Morales further agreed that when she spoke to Sergeant Olvera, he threatened to arrest her and ruin her career.

At the conclusion of trial, the jury found Garcia guilty of all three counts and the trial court sentenced him as described above. This appeal followed.

## II.    SUFFICIENCY OF THE EVIDENCE

By his first issue, Garcia argues that the evidence was legally insufficient to support his convictions.

### A.    Standard of Review & Applicable Law

"When assessing the sufficiency of the evidence to support a criminal conviction, reviewing courts consider the evidence in the light most favorable to the verdict and determine whether, based on the evidence and reasonable inferences therefrom, a rational juror could have found that the State has proven the essential elements of the crime beyond a reasonable doubt." *Baltimore v. State*, 689 S.W.3d 331, 341 (Tex. Crim. App. 2024). "The sufficiency of the evidence is measured by comparing the evidence produced at trial to 'the essential elements of the offense as defined by the hypothetically correct jury charge.'" *Metcalf v. State*, 597 S.W.3d 847, 856 (Tex. Crim. App. 2020). (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). The hypothetically correct jury charge is one that "accurately sets out the law, is authorized by the indictment,

does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.* (citing *Malik*, 953 S.W.2d at 240). "The law 'authorized by the indictment' consists of the statutory elements of the offense as modified by the indictment allegations." *Id.*

A hypothetically correct charge, consistent with the indictment in this case, would instruct the jury to find Garcia guilty of state-jail felony tampering with a governmental record if he used each page of the TCOLE training course reports "with knowledge of its falsity[,] . . . with intent that it be taken as a genuine governmental record," and with the intent to defraud TMPA. *See* TEX. PENAL CODE ANN. § 37.10(a)(2), (c)(1).

## B. Analysis

Garcia argues that the evidence was insufficient to demonstrate that the records were false and that he knew they were false. *See id.* The indictment alleged that the TCOLE training course reports which Garcia submitted were false because Pena, Mendiola, and Morales "did [not] physically attend the training course." But Garcia never literally represented that the officers physically attended the course. Garcia merely represented that the officers "completed" the course. Accordingly, the sufficiency of the evidence in this case depends on whether the term "completed" also connotes physical attendance.

Both Flatt and Sergeant Olvera pointed to Garcia's contract with TMPA to derive the meaning of the term "completed." The contract provided: "At least 10 students must register for any class. In the event less than 10 students begin the class, TMPA reserves

11

the right to compensate the service provider at $85 per student who completes the 3-day SAFVIC class (Completion defined as full attendance and completion of the final examination)." This provision defines what completion is in terms of calculating Garcia's compensation when fewer than ten students begin the class, but it does not purport to define what completion is in any other context.

Sergeant Olvera testified that, to him, the term "completed" meant "[t]hat they have to be present in full attendance. They have to be there all three days for eight hours a day." But because the State was required to prove that Garcia knew these reports were false at the time he submitted them to TMPA, *his* understanding of the term "completed" controls, not TMPA's and not TCOLE's. *See id.* § 6.03(b) ("A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist."); *id.* § 37.10(a)(2) (providing that a person must have "knowledge of [a record's] falsity"); *Ratliff v. State*, 663 S.W.3d 106, 115 (Tex. Crim. App. 2022) ("At most, the State's witness testimony supports the proposition that these witnesses disagree with Harden's offense reporting style. But this testimony does not address the root of the issue— Appellant's knowledge that the account of the offense in the report w[as] false. In other words, the State failed, not only to show that anything in Harden's statement was false, but that Appellant was aware that it was false."); *cf. Smith v. State*, 363 S.W.3d 761, 776 (Tex. App.—Austin 2012, pet. ref'd) ("[I]t is also significant that the statutorily prohibited conduct (giving a 'false' or 'fictitious' name under the circumstances described) is immediately preceded by the word 'intentionally,' which denotes that the culpable mental

12

state is connected with the conduct itself."). To that end, Garcia never represented that Pena, Mendiola, and Morales attended the course in person. Instead, he openly admitted that Mendiola did not attend the course in person, but he provided outside instruction to help him understand the curriculum—and ensuring students understood the curriculum is precisely what his contract with TMPA required him to do.

Both Sergeant Olvera and Flatt acknowledged that there is nothing in TCOLE's or TMPA's training materials that disavows self-studying as a method of "completing" a course. And in common parlance, especially when it relates to education, "completing" a class does not always require "physical attendance" at every session of the class. Under the State's proffered interpretation of the term, a student who failed the class, was mentally checked out all three days, distracted other students, but was physically present for every second of the class has "completed" the class. On the other hand, a student who left the class once to take a bathroom break or who leaves class early to attend to an emergency has not "completed" it, as, per Flatt, "There's no minimum or max amount of time that can be missed. There's nowhere in the TCOLE rulebook that says that. It just says—not verbatim—that you have to attend all sessions, all hours, to receive credit for that class." Such an all or nothing interpretation is patently nonsensical, especially when criminal liability is on the line for the instructor who signs off on the roster sheet. And the fact that the reports are the functional equivalent of a sign-in sheet also does not support the notion that "completed" means "full attendance," as one can easily imagine a student writing their name on the sheet in the morning and leaving at lunch.

But even if the State's interpretation of the term "completed" is the correct one, the court of criminal appeals has held in the perjury context that "where the statement which is the basis of the accusation is a matter of construction, or a deduction from given facts, that it is erroneous, or is not a correct construction, or is not a logical deduction from all the facts, [it] cannot constitute . . . false swearing." *Schoenfeld v. State*, 119 S.W.101, 109 (Tex. Crim. App. 1909); *see State v. Eversole*, 889 S.W.2d 418, 420 (Tex. App.–Houston [14th Dist.] 1994, pet. ref'd) (citing *Schoenfeld*, 119 S.W. at 103–04). We see no reason why this rule should not also apply to tampering with a governmental record, which is contained within the same chapter of the penal code as perjury. *See* TEX. PENAL CODE ANN. ch. 37 (entitled "Perjury and Other Falsification").

And to that end, whether Pena, Mendiola, and Morales "completed" the class is a matter of interpretation. All three studied the course materials and passed the final exam with flying colors. Garcia provided two additional hours of instruction each day to Pena and Mendiola to ensure they understood the materials, and he followed up with Morales to double check that she completed the necessary study aids. And ultimately, TCOLE clearly believed they completed the class, as they all eventually received credit for it.

The occupations code specifically contemplates that certain continuing education courses for law enforcement officers may not be provided in particular formats. *See, e.g.*, TEX. OCC. CODE ANN. § 1701.352(g) ("The training and education program on de-escalation and crisis intervention techniques to facilitate interaction with persons with mental impairments under Subsection (b)(2)(B) may not be provided as an online course."). But it does not prohibit such an approach for the type of course Garcia taught.

14

*See id.* § 1701.352(b)(2)(D)(i), (c) (providing that a continuing education course dealing with "the recognition, documentation, and investigation of cases that involve . . . family violence[] and sexual assault . . . . may use instructional materials developed by the agency or its trainers or by entities having training agreements with the commission in addition to materials included in curricula developed by [TCOLE]"). Indeed, distance learning is specifically contemplated as a viable instruction option under the applicable section of the Texas Administrative Code, and is defined as "[s]tudy, at a distance, with an educational provider that conducts organized, formal learning opportunities for students." 37 TEX. ADMIN. CODE § 211.1(a)(21).

Elsewhere, the penal code punishes statements that are either "false or misleading." *See* TEX. PENAL CODE ANN. § 32.32. But in this context, only "fals[e]" statements are criminalized. *See id.* § 37.10(a)(2); *State v. Vasilas*, 187 S.W.3d 486, 489 (Tex. Crim. App. 2006) ("The seminal rule of statutory construction is to presume that the legislature meant what it said."). The TCOLE reports Garcia signed off on simply reflected that Mendiola, Pena, and Morales *completed* the course, they did not represent that these individuals *physically attended* the course. Perhaps this was misleading. But even when viewed in the light most favorable to the verdict, it was not false. Accordingly, the evidence is legally insufficient to support a finding that Garcia had "knowledge of [the reports'] falsity." *See* TEX. PENAL CODE ANN. § 37.10(a)(2); *Ratliff*, 663 S.W.3d at 115 ("It is difficult to conceive of someone being convicted of falsifying a governmental record when nothing in the record is, in fact, false."); *Schoenfeld*, 119 S.W. at 109.

15

We sustain Garcia's first issue.[6]

### III.    CONCLUSION

We reverse the trial court's judgments of conviction and render judgments of acquittal. *See Burks v. United States*, 437 U.S. 1, 18 (1978) ("[O]nce the reviewing court has found the evidence legally insufficient, the only 'just' remedy available for that court is the direction of a judgment of acquittal.").

GINA M. BENAVIDES
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
5th day of December, 2024.

---

[6] Because sustaining this issue provides Garcia with the greatest relief possible, we need not address the other issues raised. *See* TEX. R. APP. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal.").